**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**

|  |  |
|---|---|
| CLAUDE PRESTON,<br><br>       Plaintiff,<br><br>    vs.<br><br>ANGIODYNAMICS, INC.<br><br>and<br><br>NAVILYST MEDICAL, INC.,<br><br>      Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES**<br><br>**(1) NEGLIGENCE**<br>**(2) DESIGN DEFECT**<br>**(3) FAILURE TO WARN**<br>**(4) BREACH OF IMPLIED WARRANTY**<br>**(5) BREACH OF EXPRESS WARRANTY**<br>**(6) FRAUDULENT CONCEALMENT**<br>**(7) KENTUCKY'S CONSUMER**<br>    **PROTECTION ACT (KCPA)**<br>**(8) PUNITIVE DAMAGES**<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

**COMES NOW** Plaintiff, Claude Preston, (hereinafter "Plaintiff"), by and through his undersigned counsel, and brings this Complaint against AngioDynamics, Inc., and Navilyst Medical, Inc., (collectively, the "Defendants"), and alleges as follows:

1.      This is an action for damages arising out of failures relating to Defendants' design, development, testing, assembling, manufacturing, packaging, promoting, marketing, distribution, supplying, and/or selling the defective implantable vascular access device sold under the trade name of BioFlo Vortex Port (hereinafter "BioFlo Vortex" or "Defective Device").

## PARTIES

2.    Plaintiff, Claude Preston is an adult resident and citizen of Pike County, Kentucky, and claims damages as set forth below.

3.    Defendant AngioDynamics, Inc. ("AngioDynamics") is a Delaware corporation with

– 1 –

COMPLAINT

its principal place of business located in Latham, New York. AngioDynamics is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the BioFlo Vortex.

4.    Defendant Navilyst Medical, Inc. ("Navilyst") is a Delaware corporation with its principal place of business located in Marlborough, Massachusetts. Navilyst conducts business throughout the United States, including the State of Kentucky, and is a wholly owned subsidiary of AngioDynamics. Navilyst is engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, supplying, selling, marketing, and introducing into interstate commerce, either directly or indirectly through third parties or related entities, its medical devices, including the BioFlo Vortex.

## JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction over the parties pursuant to 28 U.S.C. §1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and cost.

6.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 by virtue of the facts that (a) a substantial part of the events or omissions giving rise to the claims occurred in this District, and (b) Defendants' products are produced, sold to, and consumed by individuals in the State of Kentucky, thereby subjecting Defendants to personal jurisdiction in this action and making them all "residents" of this judicial District.

7.    Defendants have and continue to conduct substantial business in the State of Kentucky and in this District, distribute vascular access products in this District, receive substantial

compensation and profits from sales of vascular access products in this District, and made material omissions and misrepresentations and breaches of warranties in this District, so as to subject them to *in personam* jurisdiction in this District.

8.    Consistent with the Due Process Clause of the Fifth and Fourteenth Amendments, this Court has *in personam* jurisdiction over Defendants because Defendants are present in the State of Kentucky, such that requiring an appearance does not offend traditional notices of fair and substantial justice.

<u>**PRODUCT BACKGROUND**</u>

9.    In or about 2007, a company called Rita Medical Systems, Inc.  received clearance via the 510(k) Premarket Notification Program from the Food and Drug Administration (FDA) to market and sell a product called Vortex® CT Port Access System.

10.    Around the same time, Angiodynamics completed the acquisition of the assets and liabilities of Rita Medical Systems, Inc. and rebranded the subject product as SmartPort CT.

11.    Defendants' Vascular Access Devices were designed, patented, manufactured, labeled, marketed, sold, and distributed by the Defendants at all relevant times herein.

12.    The BioFlo Vortex is one of several varieties of port/catheter systems that has been designed, manufactured, marketed, and sold by Defendants.

13.    According to Defendants, the BioFlo Vortex is a totally implantable vascular access device designed to provide repeated access to the vascular system for the delivery of medication, intravenous fluids, parenteral nutrition solutions, and blood products.

14.     The intended purpose of the BioFlo Vortex is to make it easier to deliver medications directly into the patient's bloodstream. The device is surgically placed completely under the skin and left implanted.

15.     The BioFlo Vortex is a system consisting of two primary components: an injection port and a polyurethane catheter which includes additives intended to make it radiopaque and anti-thrombogenic.

16.     The injection port has a raised center, or "septum," where the needle is inserted for delivery of the medication. The medication is carried from the port into the bloodstream through a small, flexible tube, called a catheter, that is inserted into a blood vessel.

17.     The BioFlo Vortex is indicated for patient therapies requiring repeated access to the vascular system. The port system can be used for infusion of medications, I.V. fluids, parenteral nutrition solutions, blood products, and for the withdrawal of blood samples.

18.     The product's catheter is comprised of a polymeric mixture of polyurethane, a barium sulfate radiopacity agent, and a low molecular weight fluorinated additive intended to reduce formation of blood clots.

19.     Barium sulfate is known to contribute to reduction of the mechanical integrity of polyurethane *in vivo* as the particles of barium sulfate dissociate from the surface of the catheter over time, leaving microfractures and other alterations of the polymeric structure and degrading the mechanical properties of the polyurethane.

20.     Researchers have shown that catheter surface degradation in products featuring a radiopaque barium sulfate stripe is concentrated at the locus of the stripe.[1]

21.     The mechanical integrity of a barium sulfate-impregnated silicone is affected by the concentration of barium sulfate as well as the heterogeneity of the modified polymer.

22.     Upon information and belief, Defendants' manufacturing process in designing and constructing the catheter implanted in Plaintiff involved too high a concentration of barium sulfate particles for the polymer formulation, leading to improperly high viscosity of the admixed polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix.

23.     This defect in the manufacturing process led to a heterogeneous modified polymer which included weakened areas at the loci of higher barium sulfate concentration and led to dislodgement of the catheter.

24.     Although the surface degradation and resultant mechanical failure can be reduced or avoided with design modifications (e.g., using a higher grade radiopacity compound and/or encapsulating the admixed polymer within polyurethane), Defendants elected not to incorporate those design elements into the BioFlo Vortex.

25.     At all times relevant, Defendants misrepresented the safety of the BioFlo Vortex system, and negligently designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold the BioFlo Vortex system as safe and effective device to be surgically implanted to provide repeated access to the vascular system for the delivery of

---

[1] See Hecker JF, Scandrett LA. Roughness and thrombogenicity of the outer surfaces of intravascular catheters. *J Biomed Mater Res*. 1985;19(4):381-395. doi:10.1002/jbm.820190404

COMPLAINT

medications, intravenous fluids, parenteral nutrition solutions, and blood products.

26.    Defendants obtained "clearance" to market these products under Section 510(k) of the Medical Device Amendments to the Food, Drug, and Cosmetic Act.

27.    Section 510(k) permits the marketing of medical devices if the device is substantially equivalent to other legally marketed predicate devices without formal review for the safety or efficacy of the device. The FDA explained the difference between the 510(k) process and the more rigorous "premarket approval" ("PMA") process in its amicus brief filed with the Third Circuit in *Horn v. Thoratec Corp.*, which the court quoted from:

> A manufacturer can obtain an FDA findings of 'substantial equivalence' by submitting a premarket notification to the agency in accordance with section 510(k) of the [Food Drug and Cosmetic Act.] 21 U.S.C. § 360(k). A device found to be 'substantially equivalent' to a predicate device is said to be 'cleared' by the FDA (as opposed to "approved' by the agency under a PMA.

> 376 F.3d 163, 167 (3d. Cir. 2004).

28.    A pre-market notification submitted under 510(k) is thus entirely different from a PMA, which must include data sufficient to demonstrate that the product involved is safe and effective.

29.    In *Medtronic, Inc.* v. Lohr, the U.S. Supreme Court similarly described the 510(k) process, observing:

> If the FDA concludes on the basis of the [manufacturer's] § 510(k) notification that the device is 'substantially equivalent' to a pre-existing device, it can be marketed without further regulatory analysis…. The § 510(k) notification process is by no means comparable to the PMA process; in contrast to the 1,200 hours necessary to complete a PMA review, the § 510(k) review is completed in average of 20 hours …. As one commentator noted: "The attraction of substantial equivalence to manufacturers is clear. Section 510(k) notification requires little information, rarely elicits a negative response form the FDA, and gets processed quickly.

518 U.S. 470, 478-79 (1996).

30.     Pursuant to *Wyeth v. Levine*, 555 U.S. 555 (2009), once a product is cleared "the manufacturer remains under an obligation to investigate and report any adverse associated with the drug…and must periodically submit any new information that may affect the FDA's previous conclusions about the safety, effectiveness, or labeling …." This obligation extends to post-market monitoring of adverse events/complaints.

31.     At all times relevant to this action, Defendants misrepresented the safety of the BioFlo Vortex system, and negligently designed, manufactured, prepared, compounded, assembled, processed, labeled, marketed, distributed, and sold the BioFlo Vortex system as safe and effective device to be surgically implanted to provide repeated access to the vascular system for the delivery of medications, intravenous fluids, parenteral nutrition solutions, and blood products.

32.     At all times relevant to this action, Defendants knew and had reason to know, that the BioFlo Vortex was not safe for the patients for whom they were prescribed and implanted, because once implanted the device was prone to fracturing, dislodgment, migrating, perforating internal vasculature, and otherwise malfunctioning.

33.     At all times relevant to this action, Defendants knew and had reason to know that patients implanted with a BioFlo Vortex port had an increased risk of suffering life threatening injuries, including but not limited to: death; infection; dislodgment; fracture; hemorrhage; cardiac/pericardial tamponade (pressure caused by a collection of blood in the area around the heart); cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; and perforations of tissue, vessels and organs, or the need for additional surgeries

to remove the defective device.

34.     Soon after the BioFlo Vortex was introduced to market, which was years before Plaintiff was implanted with his device, Defendants began receiving large numbers of adverse event reports ("AERs") from health care providers reporting that the BioFlo Vortex was fracturing post-implantation and that fractured pieces were migrating throughout the human body, including to the heart and lungs. Defendants also received large numbers of AERs reporting that the BioFlo Vortex was found to have perforated internal vasculature. These failures were often associated with reports of severe patient injuries such as:

     a.  hemorrhage;

     b.  cardiac/pericardial tamponade;

     c.  cardiac arrhythmia and other symptoms similar to myocardial infarction;

     d.  severe and persistent pain;

     e.  perforations of tissue, vessels and organs; and

     f.  upon information and belief, even death.

35.     In addition to the large number of AERs which were known to Defendants and reflected in publicly accessible databases, there are many recorded device failures and/or injuries related to the Defendants' implantable port products which were concealed from medical professionals and patients through submission to the FDA's controversial Alternative Summary Reporting ("ASR") program.

36.     The FDA halted the ASR program after its existence was exposed by a multi-part investigative piece, prompting a widespread outcry from medical professionals and patient

advocacy groups.[2]

37.     Prior to the discontinuation of the ASR program, Defendants reported numerous episodes of failures of their implanted port/catheter products – including episodes of catheter fracture and leakage, dislodgment, blood clot formation post-implantation, and infection – under the ASR exemption, thereby concealing them from physicians and patients.

38.     Defendants were aware or should have been aware that the BioFlo Vortex had a substantially higher failure rate than other similar products on the market, yet Defendants failed to warn consumers of this fact.

39.     Defendants also intentionally concealed the severity of complications caused by the BioFlo Vortex and the likelihood of these events occurring. This included, but was not limited to, knowledge that a dislodgment of the BioFlo Vortex could lead to leakage of chemotherapy medicine which can cause infection and necrosis of the surrounding tissue in the area of the BioFlo Vortex port, and that the BioFlo Vortex can cause blood clots, including pulmonary embolisms which can be deadly.

40.     Rather than alter the design of the BioFlo Vortex to make it safer or adequately warn physicians of the dangers associated with the BioFlo Vortex, Defendants continued to actively and aggressively market the BioFlo Vortex as safe, despite their knowledge of numerous reports of catheter dislodgment and associated injuries.

41.     Multiple feasible alternative designs for the BioFlo Vortex have been available to Defendants at all times relevant to this matter.

---

[2]  Christina Jewett, *Hidden Harm: Hidden FDA Reports Detail Harm Caused by Scores of Medical Devices*, Kaiser Health News (Mar. 2019)

COMPLAINT

42.    Moreover, Defendants' warnings suggested that dislodgment and migration of the device could only occur if the physician incorrectly placed the device such that undue catheter compression or "pinch-off" was allowed to occur. In reality, Defendants knew internally these devices were dislodging and causing serious injuries due to defects in the design, manufacturing and lack of adequate warnings.

43.    The conduct of Defendants, as alleged in this Complaint, constitutes willful, wanton, gross, and outrageous corporate conduct that demonstrates a conscious disregard for the safety of Plaintiff and evidences malice, fraud, gross negligence, and oppressiveness. Defendants had actual knowledge of the dangers presented by the BioFlo Vortex System, yet consciously failed to act reasonably to:

      a.  Adequately inform or warn Plaintiff, his prescribing physicians, or the public at large of these dangers;

      b.  Establish and maintain an adequate quality and post-market surveillance system; or

      c.  Recall the BioFlo Vortex System from the market.

## SPECIFIC FACTUAL ALLEGATIONS AS TO PLAINTIFF

44.    On or about March 13, 2023, Plaintiff underwent placement of an AngioDynamics BioFlo Vortex product, reference number H787CT80LPPDVI0, lot number 5666874. The device was implanted by Dr. Taha Mallick, M.D., at Tug Valley ARH in South Williamson, Kentucky, for the purpose of providing chemotherapy.

45.    Defendants, directly or through their agents, apparent agents, servants, or employees designed, manufactured, marketed, advertised, distributed and sold the BioFlo Vortex that was implanted in Plaintiff.

46.    Defendant manufactured, sold, and/or distributed the BioFlo Vortex to Plaintiff,

through his doctors, to be used for delivery of chemotherapy.

47.      On or about March 28, 2023, Plaintiff presented himself to Tug Valley ARH for port removal due to fluid leakage associated with the BioFlo Vortex.

48.      During removal of the defective device, Plaintiff's medical team discovered the catheter had disconnected from the port and could not be located. Plaintiff was  immediately transferred to Pikeville Medical Center to undergo an additional procedure to locate and remove the catheter fragment.

49.      Plaintiff underwent retrieval of the dislodged catheter that migrated to the Superior vena cava extending through the right atrium into the right ventricle. The catheter fragment was retrieved by Dr. Steven J. Krohmer, M.D., at Pikeville Medical Center in Pikeville, Kentucky.

50.      At all times, the BioFlo Vortex was utilized and implanted in a manner foreseeable to Defendants, as Defendants generated the instructions for use and created procedures for implanting the product.

51.      The BioFlo Vortex implanted in Plaintiff was in the same or substantially similar condition as when it left the possession of Defendants and in the condition directed by and expected by Defendants.

52.      Plaintiff and his physicians foreseeably used and implanted the BioFlo Vortex and did not misuse or alter the BioFlo Vortex in an unforeseeable manner.

53.      Defendants advertised, promoted, marketed, sold, and distributed the BioFlo Vortex as a safe medical device when Defendant knew or should have known the BioFlo Vortex was not safe for its intended purposes and that the product could cause serious medical problems.

54.     Defendants had sole access to material facts concerning the defective nature of the BioFlo Vortex product and its propensity to cause serious and dangerous side effects.

55.      In reliance on Defendants' representations, Plaintiff's doctors were induced to, and did use the BioFlo Vortex.

56.     As a result of having the BioFlo Vortex implanted, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, permanent and substantial physical deformity, has undergone corrective surgeries, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and present and future lost wages.

57.     Defendants' BioFlo Vortex was marketed to the medical community and to patients as a safe, effective, reliable, medical devices implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, and as safer and more effective as compared to the traditional products and procedures for treatment and other competing Vascular Access Devices.

58.     The Defendants have marketed and sold the Defendants' BioFlo Vortex to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, direct to consumer advertising, aggressive marketing to health care providers at medical conferences, hospitals, private offices, and/or group purchasing organizations, and include a provision of valuable consideration and benefits to the aforementioned.

59.     The injuries, conditions, and complications suffered due to Defendants' BioFlo Vortex include, but are not limited to, dislodgment, fracture and leakage; necrosis; infection; blood

clots; cardiac/pericardial tamponade; cardiac arrhythmia and other symptoms similar to myocardial infarction; severe and persistent pain; perforations of tissue, vessels and organs; and even death.

60.     Defendants were negligent toward Plaintiff in the following respects:

a.   Defendant failed to design and establish a safe, effective procedure for removal of BioFlo Vortex; therefore, in the event of a failure, injury, or complications it is difficult to safely remove BioFlo Vortex.

b.   Defendants provided incomplete, insufficient, and misleading information to physicians in order to increase the number of physicians using BioFlo Vortex for the purpose of increasing their sales.  By so doing, Defendants caused the dissemination of inadequate and misleading information to patients, including the Plaintiff.

61.     The BioFlo Vortex was utilized and implanted in a manner foreseeable to Defendants.

62.     The BioFlo Vortex implanted into Plaintiff was in the same or substantially similar condition as when it left the possession of the Defendants and in the condition directed by the Defendants.

63.     At the time of his operation, Plaintiff was not informed of, and had no knowledge of the complaints, known complications, and risks associated with BioFlo Vortex, including, but not limited to its propensity to dislodgment and migration and the various complications associated with leakage of chemotherapy medication.

64.     Plaintiff was never informed by Defendants of the defective and dangerous nature of BioFlo Vortex.

65.     At the time of his implant, neither Plaintiff nor Plaintiff's physicians were aware of the defective and dangerous condition of the BioFlo Vortex.

COMPLAINT

66.     Plaintiff has suffered and will continue to suffer physical pain and mental anguish.

67.     Plaintiff has also incurred substantial medical bills and has suffered loss of other monies due to the defective product that was implanted in his body.

### COUNT I: NEGLIGENCE
(Against Defendants AngioDynamics and Navilyst)

68.     Plaintiff incorporates the preceding paragraphs as if set out fully herein.

69.     The Defendants owed Plaintiff a duty to exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, selling, conducting post-market surveillance of the BioFlo Vortex, and recruitment and training of physicians to implant the BioFlo Vortex..

70.     The Defendants failed to exercise due care under the circumstances and therefore breached this duty by:

a.  Failing to properly and thoroughly test the BioFlo Vortex before releasing the device to market, and/or failing to implement feasible safety improvements;

b.  Failing to properly and thoroughly analyze the data resulting from any pre-market testing of the BioFlo Vortex;

c.  Failing to conduct sufficient post-market testing and surveillance of the BioFlo Vortex;

d.  Failing to comply with state and federal regulations concerning the study, testing, design, development, manufacture, inspection, production, advertisement, marketing, promotion, distribution, and/or sale of the BioFlo Vortex;

e.  Designing, manufacturing, marketing, advertising, distributing, and selling the BioFlo Vortex to consumers, including Plaintiff, without an adequate warning

– 14 –

COMPLAINT

of the significant and dangerous risks of the BioFlo Vortex, including, but not limited to, its propensity to dislodge and migrate, and without proper instructions to avoid the harm which could foreseeably occur as a result of using the device;

f.  Failing to exercise due care when advertising and promoting the BioFlo Vortex; and

g.  Negligently continuing to manufacture, market, advertise, and distribute the BioFlo Vortex after Defendants knew or should have known of its adverse effects.

71.    As a direct, actual, and proximate cause of the Defendants' actions, omissions, and misrepresentations, Plaintiff has suffered, and will continue to suffer, severe injuries and complications which are permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical expenses, and economic loss as alleged herein. These damages have occurred in the past and will continue into the future.

72.    In performing the foregoing acts, omissions, and misrepresentations, Defendants acted grossly negligent, fraudulently, and with malice.

## COUNT II: STRICT PRODUCTS LIABILITY – DESIGN DEFECT
(Against Defendants AngioDynamics and Navilyst)

73.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

74.    Defendant supplied, manufactured, sold, distributed and/or otherwise placed into the stream of commerce the BioFlo Vortex implanted into Plaintiff.

75.    The BioFlo Vortex implanted in Plaintiff was not reasonably safe for its intended

– 15 –

COMPLAINT

use and was defective with respect to its design.

76.     The product was defective in its design in that when it left the hands of Defendant, it was not safe for its anticipated use and safer, more reasonable alternative designs existed that could have been utilized by Defendant.

77.     The BioFlo Vortex was in a defective condition at the time that it left the possession or control of Defendants.

78.     A reasonably prudent medical device manufacturer would not have placed the BioFlo Vortex with its defective design into the stream of commerce.

79.     The BioFlo Vortex was defectively designed when supplied, sold, distributed and/or otherwise placed into the stream of commerce and when it was implanted in Plaintiff.

80.     The BioFlo Vortex was unreasonably dangerous, taking into consideration the utility of said product and the risks involved in its use. The foreseeable risks associated with the design of the product were more dangerous than a reasonably prudent consumer such as Plaintiff and/or his physician would expect when the product was used for its normal and intended purpose.

81.     The BioFlo Vortex reached Plaintiff's implanting surgeon and was implanted in Plaintiff without any substantial change in the condition in which it was supplied, distributed, sold and/or otherwise placed into the stream of commerce.

82.     The BioFlo Vortex failed to perform as safely as an ordinary consumer and/or his physician would expect when used as intended or when used in a manner reasonably foreseeable by the manufacturer, and the risks and dangers of the BioFlo Vortex outweigh its benefits.

83.     The design defects in the BioFlo Vortex were not known, knowable and/or reasonably apparent to Plaintiff and/or his physician or discoverable upon any reasonable

examination.

84.     The BioFlo Vortex was used and implanted in the manner in which it was intended to be used and implanted by Defendants pursuant to the instructions for use and the product specifications provided by Defendants.

85.     Defendants are strictly liable to the Plaintiff for designing, manufacturing, marketing, labeling, packaging, and selling a defective product.

86.     As a direct and proximate result of the BioFlo Vortex's aforementioned defects, the Plaintiff was caused and/or in the future will be caused to suffer severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages.

## COUNT III: STRICT PRODUCTS LIABILITY – FAILURE TO WARN
(Against Defendants AngioDynamics and Navilyst)

87.     Plaintiff incorporates the preceding paragraphs as if set out fully herein.

88.     Defendants designed, set specifications, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the BioFlo Vortex, including the one implanted into Plaintiff, into the stream of commerce and in the course of same, directly advertised and marketed the device to consumers or persons responsible for consumers, and therefore had a duty to warn of the risk of harm associated with the use of the device and to provide adequate instructions on the safe and proper use of the device.

89.     At the time Defendants designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold the device into the stream of commerce, the device was defective and presented a substantial danger to users of the product when put to its intended and reasonably anticipated use, namely as an implanted port/catheter

system to administer the medications.

90.     Defendants failed to adequately warn of the device's known or reasonably scientifically knowable dangerous propensities and further failed to adequately provide instructions on the safe and proper use of the device.

91.     Defendants knew or should have known at the time they manufactured, labeled, distributed and sold the BioFlo Vortex that was implanted into Plaintiff that the BioFlo Vortex posed a significant and higher risk than other similar devices of device failure and resulting serious injuries.

92.     Defendants further knew that these devices were dislodging and migrating for reasons other than "pinch-off" caused by the physician's initial placement of the device.

93.     Defendants failed to timely and reasonably warn of material facts regarding the safety and efficacy of the BioFlo Vortex; no reasonable health care provider, including Plaintiff's, and no reasonable patient would have used the device in the manner directed, had those facts been made known to the prescribing healthcare providers or the consumers of the device.

94.     The warnings, labels, and instructions provided by the Defendants at all time relevant to this action, are and were inaccurate, intentionally misleading, and misinformed and misrepresented the risks and benefits and lack of safety and efficacy associated with the device.

95.     The health risks associated with the device as described herein are of such a nature that ordinary consumers would not have readily recognized the potential harm.

96.     The BioFlo Vortex, which was designed, manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold into the stream of commerce by Defendants, was defective at the time of release into the stream of commerce due to inadequate

warnings, labeling and/or instructions accompanying the product.

97.    When Plaintiff was implanted with the device, Defendants failed to provide adequate warnings, instructions, or labels regarding the severity and extent of health risks posed by the device, as discussed herein.

98.    Defendants intentionally underreported the number and nature of adverse events associated with dislodgment of the devices to Plaintiff's health care providers, as well as the FDA.

99.    Neither Plaintiff nor his health care providers knew of the substantial danger associated with the intended and foreseeable use of the device as described herein.

100.    Plaintiff and his health care providers used the BioFlo Vortex in a normal, customary, intended, and foreseeable manner, namely as a surgically placed device used to make it easier to deliver medications directly into the patient's bloodstream. Moreover, Plaintiff's health care providers did not place or maintain the device incorrectly such that it caused the device to "pinch off" or otherwise malfunction.

101.    Upon information and belief, the defective and dangerous condition of the device, including the one implanted into Plaintiff, existed at the time they were manufactured, prepared, compounded, assembled, processed, marketed, labeled, distributed, and sold by Defendants to distributors and/or healthcare professionals or organizations.

102.    Upon information and belief, the device implanted in Plaintiff was in the same condition as when it was manufactured, inspected, marketed, labeled, promoted, distributed and sold by Defendants.

103.    Defendants' lack of sufficient warning and/or instructions was the direct and proximate cause of Plaintiff's serious physical injuries, and economic damages in an amount to be

determined at trial. In other words, had Defendants provided adequate warnings, Plaintiff and his physicians would not have used the device.

## COUNT IV: BREACH OF IMPLIED WARRANTY
(Against Defendants AngioDynamics and Navilyst)

104.    Plaintiff incorporates preceding paragraphs as if set out fully herein.

105.    Defendants impliedly warranted that the BioFlo Vortex was merchantable and fit for the ordinary purposes for which it was intended.

106.    When the BioFlo Vortex was implanted in the Plaintiff, it was being used for the ordinary purposes for which it was intended.

107.    The Plaintiff, individually and/or by and through his physician, relied upon Defendants' implied warranties of merchantability in consenting to have the BioFlo Vortex implanted in him.

108.    Privity exists between Plaintiff because Plaintiff's physicians acted as Plaintiff's purchasing agents in the subject transaction and/or because Plaintiff was a third-party beneficiary of the subject contract.

109.    Defendants breached these implied warranties of merchantability because the BioFlo Vortex implanted in Plaintiff was neither merchantable nor suited for its intended uses as warranted in that the device varied from its intended specifications, which included, but are not limited to, variances in the following respects:

a.    Defendants' manufacturing process in constructing the catheter of the BioFlo Vortex implanted in Plaintiff involved too high of a concentration of barium sulfate particles for the polymer formulation, which led to improperly high viscosity of the admixed

– 20 –

COMPLAINT

polyurethane before polymerization and causing improper mixing of barium sulfate particles within the polymer matrix;

b.  Defendants' knew or should have known barium sulfate is known to contribute to a reduction in the mechanical integrity of the polyurethane in its product, the BioFlo Vortex, as the barium sulfate particles dissociate from the surface of the catheter over time; and

c.  These defects led to a heterogenous modified polymer that included microfractures and weakened areas at the location of the higher barium sulfate concentration that ultimately led to fractures and dislodgments of the BioFlo Vortex and associated injuries.

d.  Defendants represented to Plaintiff and his physicians and healthcare providers through its labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that the Defendants' BioFlo Vortex was of merchantable quality and safe when used for its intended purpose meanwhile Defendant fraudulently withheld and concealed information about the substantial risks of serious injury associated with using BioFlo Vortex;

e.  Defendant represented to Plaintiff and his physicians and healthcare providers that the Defendants' BioFlo Vortex was safe, as safe as and/or safer than other alternative procedures and devices, meanwhile Defendant fraudulently concealed information, which demonstrated that the BioFlo Vortex was not safe, as safe as or safer than alternatives and other products available on the market; and

f.  Defendants represented to Plaintiff and his physicians and healthcare providers that the Defendants' BioFlo Vortex was more efficacious than other alternative

procedures and/or devices. Meanwhile Defendant fraudulently concealed information, regarding the true efficacy of the BioFlo Vortex product.

110.     Defendants' breaches of their implied warranties resulted in the implantation of an unreasonably dangerous and defective product, the BioFlo Vortex, into Plaintiff's body, placing said Plaintiff's health and safety in jeopardy.

111.     The BioFlo Vortex was sold to Plaintiff's health care providers for implantation in patients, such as Plaintiff.

112.     As a direct and proximate result of Defendants' breaches of the aforementioned implied warranties, Plaintiff suffered severe personal injuries, pain and suffering, severe emotional distress, financial or economic loss, including, but not limited to, obligations for medical services and expenses, and other damages. These damages have occurred in the past and will continue into the future.

113.     Upon information and belief, Plaintiff's healthcare providers sent notice to Defendants of the adverse event that occurred to Plaintiff and thus, the nonconformity of the BioFlo Vortex, within a reasonable period of time following discovery of the breach of warranty and before suit was filed.

## COUNT V: BREACH OF EXPRESS WARRANTY
(Against Defendants AngioDynamics and Navilyst)

114.     Plaintiff incorporates the preceding paragraphs as if set out fully herein.

115.     Defendants through their officers, directors, agents, representatives, and written literature and packaging, and written and media advertisement, expressly warranted that the BioFlo Vortex was safe and fit for use by consumers, was of merchantable quality, did not produce dangerous side effects, and was adequately tested and fit for its intended use.

– 22 –

116.    The BioFlo Vortex does not conform to the Defendants' express representations because it is not reasonably safe, has numerous serious side effects, and causes severe and permanent injury.

114.    Defendants further breached express representations and warranties made to Plaintiff, his physicians and healthcare providers with respect to the BioFlo Vortex implanted in Plaintiff in the following respects:

    a.  Defendant represented to Plaintiff and his physicians and healthcare providers through labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions among other ways that the Defendants' BioFlo Vortex was safe, meanwhile Defendant fraudulently withheld and concealed information about the substantial risks of serious injury associated with using BioFlo Vortex;

    b.  Defendant represented to Plaintiff and his physicians and healthcare providers that the Defendants' BioFlo Vortex was as safe and/or safer than other alternative procedures and devices then on the market, meanwhile Defendant fraudulently concealed information that demonstrated that BioFlo Vortex was not safer than alternative therapies and products available on the market; and

    c.  Defendant represented to Plaintiff and his physicians and healthcare providers that the Defendants' BioFlo Vortex was more efficacious than other alternative procedures, therapies and/or devices. Meanwhile Defendant fraudulently concealed information, regarding the true efficacy of BioFlo Vortex.

117.    At all relevant times, the BioFlo Vortex did not perform as safely as an ordinary consumer would expect, when used as intended or in a reasonably foreseeable manner.

118.    Plaintiff, his physicians, and the medical community reasonably relied upon the Defendants' express warranties for the BioFlo Vortex.

119.    At all relevant times, the BioFlo Vortex was used on Plaintiff by Plaintiff's physicians for the purpose and in the manner intended by Defendants.

120.    Plaintiff and Plaintiff's physicians, by the use of reasonable care, could not have discovered the breached warranty and realized its danger.

121.    As a direct and proximate result of the breach of Defendants' express warranties, Plaintiff has suffered, and will continue to suffer, severe physical pain and injuries which are permanent and lasting in nature, emotional distress, medical and nursing expenses, surgical expenses, and economic loss as alleged herein. These damages have occurred in the past and will continue into the future.

122.    Upon information and belief, Plaintiff's healthcare providers sent notice to Defendants of the adverse event that occurred to Plaintiff and thus, the nonconformity of the BioFlo Vortex, within a reasonable period of time following discovery of the breach of warranty and before suit was filed.

### COUNT VI: FRAUDULENT CONCEALMENT
(Against Defendants AngioDynamics and Navilyst)

123.    Plaintiff incorporates the preceding paragraphs as if set out fully herein.

124.    Defendants made false statements and representations to Plaintiff and his healthcare providers concerning the BioFlo Vortex product implanted in Plaintiff.

– 24 –

COMPLAINT

125.   Defendants engaged in and fraudulently concealed information with respect to the BioFlo Vortex in the following respects:

a.   Defendants represented through the labeling, advertising, marketing materials, seminar presentations, publications, notice letters, and regulatory submissions that the BioFlo Vortex was safe and fraudulently withheld and concealed information about the substantial risks of using the BioFlo Vortex, including but not limited to, its heightened propensity to fracture, leak, and cause complications, including necrosis, infection, and blood clots;

b.   Defendants represented that the BioFlo Vortex was safer than other alternative systems and fraudulently concealed information which demonstrated that the BioFlo Vortex was not safer than alternatives available on the market;

c.   Defendants concealed that it knew these devices were dislodging and causing complications from causes other than the manner in which the implanting physician implanted the device; and

d.   That frequency of these failures and the severity of injuries were substantially worse than had been reported.

126.   Defendants had knowledge that the representations they made concerning the BioFlo Vortex, as stated above, were false.

127.   Defendants had sole access to material facts concerning the dangers and unreasonable risks of the BioFlo Vortex.

128.   The concealment of information by the Defendants about the risks of the BioFlo Vortex was intentional.

– 25 –

COMPLAINT

129.   The concealment of information and the misrepresentations about the BioFlo Vortex was made by the Defendants with the intent that Plaintiff's health care providers and Plaintiff rely upon them.

130.   Plaintiff and his physicians relied upon the representations and were unaware of the substantial risks of the BioFlo Vortex which the Defendants concealed from the public, including Plaintiff and his physicians.

131.   As a direct and proximate result of the Defendants' actions, omissions and misrepresentations, Plaintiff has suffered, and will continue to suffer, severe physical pain and injuries which are permanent and lasting in nature, emotional distress, loss of the capacity for the enjoyment of life, medical and nursing expenses, surgical expenses, and economic loss as alleged herein. These damages have occurred in the past and will continue into the future.

132.   The Defendants acted with oppression, fraud, and malice towards Plaintiff.

133.   Had Defendants not concealed this information, neither Plaintiff's nor his health care providers would have consented to using the device in Plaintiff.

## COUNT VII: KENTUCKY'S CONSUMER PROTECTION ACT
### (Against Defendants AngioDynamics and Navilyst)

134.   Plaintiff incorporates the preceding paragraphs as if set out fully herein.

135.   Plaintiff purchased the BioFlo Vortex, and the product was intended for personal use.

136.   The acts and practices engaged in by Defendants as outlined above constitute unlawful, unfair, and/or fraudulent business practices in violation of the Kentucky's Consumer Protection Act, (the "KCPA"), Ky. Rev. Stat. Ann. § 367.110 (West), *et seq.*

137.     Defendants engaged in unlawful practices including deception, false promises, misrepresentation, and/or the concealment, suppression, or omission of material facts in connection with the sale, distribution, and/or advertisement of the BioFlo Vortex in violation of the KCPA.

138.     Plaintiff purchased the BioFlo Vortex, a product that was falsely represented as having certain characteristics and benefits it did not have, *inter alia*, that it was reasonably safe for use, as further set forth above, in violation of the KCPA.

139.     Defendants further knowingly or recklessly engaged in unfair, unconscionable, deceptive, deliberately misleading, false, and/or fraudulent and deceptive acts and practices, all in violation of the KCPA, and as further described herein, which created a likelihood of confusion or misunderstanding on Plaintiff's part with respect to the BioFlo Vortex he purchased, including, but not limited to, misrepresenting that the BioFlo Vortex was reasonably safe for use and failing to adequately disclose the substantial risk of dislodgment and migration, and harm the product entailed given the large number of adverse events Defendants knew or should have been aware of but did not adequately disclose to Plaintiff.

140.     Defendants' practices were likely to mislead consumers who acted reasonably to their detriment in purchasing the product based on Defendants' representations that it was reasonably safe for use when it in fact was not and had a higher risk of dislodgment due to its defective design.

141.     Defendants intended for Plaintiff, Plaintiff's physicians, and other consumers to rely on their deceptive practices and representations in order to continue selling and manufacturing the BioFlo Vortex.

142.    As a result of Defendants' conduct, Plaintiff suffered actual damages in that the product he purchased was misrepresented and worth far less than the product he thought he had purchased, had Defendants' representations been true.

## PUNITIVE DAMAGES

143.    Plaintiff is entitled to an award of punitive and exemplary damages based upon Defendants' intentional, willful, knowing, fraudulent, malicious acts, omissions, and conduct, and their complete and total reckless disregard for the public safety and welfare. Defendants intentionally and fraudulently misrepresented facts and information to both the healthcare community and the general public, including Plaintiff and his health care providers, by making intentionally false and fraudulent misrepresentations about the safety and efficacy of the BioFlo Vortex. Defendants intentionally concealed the true facts and information regarding the serious risks of harm associated with the implantation of said product, and intentionally downplayed the type, nature, and extent of the adverse side effects of being implanted with the device, despite Defendants' knowledge and awareness of the serious and permanent side effects and risks associated with use of same. Defendants further intentionally sought to mislead health care providers and patients, including Plaintiff and his health care providers, regarding the cause of failures of the device.

144.    Defendants had knowledge of, and were in possession of evidence demonstrating that, the BioFlo Vortex caused serious physical side effects. Defendants continued to market said product by providing false and misleading information with regard to the product's safety and efficacy to the regulatory agencies, the medical community, and consumers of the device, notwithstanding Defendants' knowledge of the true serious side effects of the BioFlo Vortex,

Defendants failed to provide accurate information and warnings to the healthcare community that would have dissuaded physicians from surgically implanting the BioFlo Vortex and consumers from agreeing to being implanted with the BioFlo Vortex, thus depriving physicians and consumers from weighing the true risks against the benefits of prescribing and implanting the BioFlo Vortex.

145.   As a direct, proximate, and legal result of Defendants' acts and omissions a described herein, and Plaintiff's implantation with Defendants' defective product, Plaintiff suffered, and will continue to suffer, the injuries and damages described in this complaint.

## <u>PRAYER</u>

**WHEREFORE**, Plaintiff prays for judgment against each of the Defendants as follows:

a.   Judgment be entered against all Defendant on all causes of action of this Complaint;

b.   Plaintiff be awarded his full, fair, and complete recovery for all claims and causes of action relevant to this action;

c.   Plaintiff be awarded general damages according to proof at the time of trial;

d.   Plaintiff be awarded damages, including past, present, and future, medical expenses according to proof at the time of trial;

e.   Awarding pre-judgment and post-judgment interest to the Plaintiff;

f.   Awarding the costs and the expenses of this litigation to the Plaintiff;

g.   For such other and further relief as the court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands trial by jury on all issues.

Date:   March 19, 2024

Respectfully submitted,

**ALEX DAVIS LAW OFFICE PSC**

*/s/ Alex C. Davis*
Alex C. Davis, KY# 94899
445 Baxter Ave., Suite 275
Louisville, Kentucky 40204
Phone: (502) 882-6000
Fax: (502) 587-2007
alex@acdavislaw.com

Adam M. Evans, pro hac vice pending
DICKERSON OXTON
1100 Main St., Suite 2550
Kansas City, MO 64105
Phone: (816) 268-1960
Fax: (816) 268-1965
aevans@dickersonoxton.com
*ATTORNEYS FOR PLAINTIFF*

COMPLAINT